We'll call the next case Danielle Santomenno et al. v. John Hancock Life Insurance Company. May it please the Court, Stephen Skillman of Schaeferman-Lycan, representing the Plano plaintiffs. With the Court's permission, I would like to reserve two minutes for rebuttal. That request will be granted. Did you drop count six, the revenue sharing count seven, improperly selecting the J.H.D. Money Market Trust? As I read it, you've only got one through five that Hancock breached fiduciary terms. That's certainly been the emphasis of our brief, Your Honor. We are not withdrawing those two counts, but we are limiting those counts to claims of excessive fees, which constitutes a modification of the allegations made in those two counts. You're moving ahead on excessive fees. Excessive fees is the common thread that runs through all seven counts of our complaint, and insofar as counts six and seven may be read to contain additional assertions beyond those of excessive fees, we will not be pursuing those. Can you clarify something for me? There's another sentimental case versus John Hancock in one of the districts in California, I believe. Started in New Jersey, got transferred to California. How do we end up with a separate case? Same name? I assume the same person. No, sisters. Okay, that's the explanation. Their father was a prior client of the firm. He saw some problems with the fees being charged to his daughters. I'm just trying to figure out how the same person had the two cases. No, they are sisters, but they are different people. Okay. Before I get into the specific subsections of the definition of functional fiduciary upon which we're relying, I would just like to briefly make two preliminary comments. And the first, as this court has previously recognized, is that the ERISA definitions of functional fiduciary are to be broadly construed. And that's a pretty elementary proposition, but I start with that because I suggest that some of John Hancock's arguments are really seeking a quite restrictive view of the definitions of functional fiduciary. The second preliminary point that I would like to make is that while ERISA imposes certain disclosure obligations upon non-fiduciaries who deal with retirement plans, generally it does not impose substantive obligations. There are a few exceptions to that. But generally it does not impose substantive obligations upon non-fiduciaries. However, it does impose significant substantive obligations upon fiduciaries and the particular substantive obligation that's involved in this case is the obligation not to charge excessive fees for the performance of those fiduciary services. Now, turning to the specific subsections of the definition of fiduciary, of a functional fiduciary that we rely upon. Do you include the administrative maintenance charge in that? Do any of your seven counts claim the administrative maintenance charge is excessive? There is not a separate count that deals with the administrative maintenance charge, and I know John Hancock has argued that because of that it's not in the case. But I think reading the complaint as a whole, it's clear that the excessive fees that we are alleging include the administrative maintenance charge. You didn't mention it. Excuse me? You didn't specifically. Not in the seven counts of the complaint, but in the preliminary paragraphs of the complaint, it is mentioned multiple times. Well, all right. Now, let's say giving investment advice makes John Hancock a fiduciary. How does that relate to excessive fees? I think once a party has status of a functional fiduciary, they have all the obligations that ERISA imposes upon them, and those obligations include the obligation not to charge excessive fees. All right. Now, the trustees have the final say over which funds go on the small menu, right? Correct. Perhaps strongly influenced by the offer of the fiduciary standards warranty. But they have the final say nevertheless. They do have the final say. How is John Hancock a fiduciary under that circumstance? Because, number one, it is an investment advisor. It renders investment advice for a fee. And the mere fact that the trustee retains the ultimate. To the whole world, though. Isn't that right? It's very broad advice that they give. There's a big menu and a small menu. Well, I'm not sure that the advice is all that broad. They advertise that it is plan-specific. Well, I know. I'm aware of that. But didn't it turn out under the facts that the investment advice they gave was very broad as to the big menu? Well, that is not what our complaint alleges, and we're still at the point of a motion to dismiss under 12B-6. It's possible that after discovery the facts will turn out to be different than what we allege in the complaint. But that is not what we allege. I want to ask you about your allegations regarding the sales and service fee. Are you alleging that the fee was excessive, or are you alleging that it was never disclosed in the contract, or are you alleging both? We are alleging both, although our emphasis has been upon the excessiveness. But we are alleging both. There is no mention of that fee anywhere in either of the two contracts here, and the complaint alleges that it was imposed unilaterally. It seems a little hard to believe, but that's what appears from the record that's before the court. Do you have a reference as to where you allege that in your complaint? I can't quickly give that to you. You can provide that to us? I'll try to provide that at the time of my rebuttal. Okay. All right. I think it is noteworthy in dealing with subsection 2 that it carves out one particular type of service provider for different treatment than other service providers. It deals specifically with those who give investment advice for a fee, and in that sense subsection 2 distinguishes between that form of service provider and any other kind of service provider, whether they be lawyers, accountants, actuaries, consultants, whatever. With respect to other service providers, there has to be under the first part of subsection 1 and under subsection 3 a showing of some kind of discretionary authority. Discretionary authority is not a component of subsection 2 of the statute, and I think is different in that significant respect. Now, the Department of Labor has recognized in 2010 that its regulation interpreting subsection 2 significantly narrows the plain language of the statute, and we argue that in light of that, that regulation is no longer entitled to Chevron deference. But even if we're wrong in that contention, we believe that the allegations of our complaint satisfy the five-factor test set forth in that regulation. John Hancock is the one and only advisor to these retirement plans. It provides that advice on a regular basis through its fund check program, and John Hancock states that its review of the plans of the retirement, its advice, is plan-specific. So we believe that we satisfy that requirement. How about Renfro versus Unisys? We decided that about three years ago, 671 F3, 314. Didn't that case say that a service provider was not an ERISA fiduciary when the employer had final say over what investment options were provided to employees? And it's also held that a 401k service provider owes no fiduciary duty with respect to negotiation of its fee compensation. How do you distinguish that? Well, as to the first part of that, the particular service provider involved in that case, Fidelity, was a directed trustee, and it was acknowledged that they were a fiduciary in their role as a directed trustee. There was a further allegation, however, that the breach of fiduciary duty consisted of selection of funds, and the court found that they were not a fiduciary in that respect because the employer, Unisys, had no obligation to just go through Fidelity. They could go through any other service provider. That was not the case here? That's not the case here. That's the allegation of the complaint, and again, it may turn out in discovery that that allegation is incorrect, but we allege at least that John Hancock is the one and only service provider. Even though other funds can be selected? Even though other funds can be selected through the John Hancock group annuity contract, not selected, not purchased directly. They are all through the John Hancock group annuity contract, and that's really the primary source of the excessive fees that we claim constitute the breach of fiduciary. As a participant, I could select a TRO price fund, but it would have to go through John Hancock and they would get the referral fee. And that would result in paying not only TRO prices fees, but also the overlay of John Hancock's fees, the sales and service fee, the administrative maintenance charge in some instances. Now, as to the second part of Your Honor's question, I realize that there is a sentence that picks up on cases from the Seventh Circuit, and that sentence states that Fidelity owes no fiduciary duty with respect to the negotiation of its compensation by Unisys. And in that particular case, the fee was set prior to the undertaking of the fiduciary relationship. And I'll speak in a minute about how this case is different. But that sentence is then followed by this sentence, and I'm at the first sentence of the second paragraph, or maybe it's the third paragraph, under subsection 2B, which says, even assuming Fidelity's subsequent assumption of the role of a directed trustee could subject it to co-fiduciary liability for a breach by Unisys, that doesn't matter in this case because the complaint doesn't allege knowledge. There has to be knowledge alleged in order for there to be co-fiduciary liability, and that's not what we have in this case. Your Honors, I see that my time is up. We'll have you back on rebuttal. We will have you back on rebuttal. Thank you. And we'll hear from the Department of Labor. I'm hesitant to try to pronounce that name. Vishnu Vajula. I have a long, hard name to pronounce. Yes, Your Honor. Good morning. May it please the Court. I'm Radha Vishnu Vajula for the Secretary of Labor. The issue I'm here to address, and the narrow issue on appeal here, is whether John Hancock was a fiduciary with respect to certain activities that put it in charge of investment decisions after it entered into contracts with the plans. John Hancock was a fiduciary with respect to subsections 1 and 3 of the broad functional fiduciary definition of ERISA at 29 U.S.C. 100221A with respect to both setting fees and substituting funds and share classes. The difference between subsections 1 and 3, which has been recognized by this Court, is that subsection 1 confers fiduciary status on those who exercise control over plan assets or plan management, while subsection 3 confers fiduciary status on those who have discretionary authority over plan administration. I'd like to make two points today. First, that John Hancock had discretionary authority or responsibility over both fund substitution and the fees that it set, making it a fiduciary under subsection 3. And that John Hancock actually did exercise this authority on occasion, making it a fiduciary under subsection 1. I'd first like to address subsection 3 with respect to the fees that John Hancock set. It implemented the administrative maintenance charge and allowed itself to charge up to a maximum of 1 percent, but it was able to change that fee within that maximum of 1 percent without giving notice to the plans, and it retained the discretion to change the maximum as long as it gave notice but didn't have to seek approval. And with respect to fund substitution under subsection 3, John Hancock engaged in ongoing monitoring and evaluation of the mutual funds that it offered through its underlying fund replacement regimen, and so it had the discretionary authority to make substitutions whenever it thought it was prudent to do so. And with respect to subsection 1, with respect to the fees, John Hancock did unilaterally set that sales and service fee and unilaterally changed the administrative maintenance charge up to the contractual maximum. When you say under subsection 1, unilaterally set the fee, wasn't that before it became a fiduciary? With respect to the sales and service fee, the allegations are that that was not disclosed before the contracts were entered into, and so that fee was established after it became... Sales and service? Yes, Your Honor. And so that fee was not disclosed to the participants before the contracts were entered into. The complaint alleges that it wasn't the subject of any negotiation before the contracts were entered into. That was disclosed in a booklet that was sent to participants, though, was it not? That's right, Your Honor. It was disclosed in the Your Investment Options booklet, but that was given to participants after these contracts were entered into. So they did eventually disclose the existence of the fee, but that was after the contracts were entered into, and so it couldn't have been the subject of the negotiations beforehand. There's nothing to preclude in this case or in these plans for the participants for withdrawing from those funds, is there? There are allegations that there were termination fees charged. I believe it's paragraph 213 of the complaint. The plaintiffs allege that they couldn't cancel their contracts without a termination fee, and it does appear that there might be a dispute about that fact, but to the extent that there's a factual dispute, I think that's another reason why this should not have been dismissed on the pleadings and there should have been more factual development. And with respect to the funds, John Hancock engaged in ongoing monitoring through the fund check and underlying fund replacement regimen, and there are allegations that it did actually make some substitutions to the funds that it offered on its big menu. And as I think Judge Van Interpen mentioned earlier, the key is who has the final say over these changes. So the allegations indicate that with respect to the fund substitution, John Hancock would make changes, and if the participants didn't agree with those changes, their only recourse would have been to cancel their contracts, and they didn't have the opportunity, a meaningful opportunity, to reject a substitution that they didn't agree with. And again, you mentioned the Renfro case. The thing that makes this different, especially with respect to the sales and service fees, is that in Renfro this court held that fees that were established before entering into the contracts could not be the basis of finding fiduciary status just because they were the subject of the negotiation for entering into the contracts. And here the sales and service fees are very different from those fees. And it appears that I am just about out of time, so if there are no further questions. We thank you very much for your participation. And we'll hear from Mr. Fleckner. Thank you, Your Honors. May it please the Court, my name is Jamie Fleckner. I'm here today at the law firm of Goodwin Proctor on behalf of all the John Hancock defendants, the appellees in this case. I'd like to clarify a number of errors of the record, frankly, that were related in the prior discussion. First and foremost, Your Honor, there's nothing in the contracts or pleaded in the allegations that states that the trustees couldn't at any time go to a different provider or even when the contract was in force that they couldn't use funds outside of the contract. And I think it's just very important to look at the record itself here. The contract, one contract mentions explicitly the right of the trustees to use outside funds. That's the Burge contract. There's two contracts for the three participants. They participated in two plans sponsored by their employers, you know, as under ERISA, employers decide if there's going to be a plan. They decide who the trustees are, and under the statute, as we reflect, the trustees have the exclusive authority. So they are trustees of the exclusive authority. And in the one contract… It has to come through John Hancock. It does not, Your Honor. Okay. In the Burge contract, it says specifically at JA 219, the Joint Appendix 219, defines a competing investment option as any fund or investment vehicle available under the plan either in the contract or elsewhere. So the one contract explicitly says there can be funds outside just like in Renfro. Now in their briefing, they say there's a limitation on this, and they point to a limitation that says that John Hancock, and this is at 215 and in their brief, that John Hancock has the right, reserves the right to review any new investment option to determine that it's not a competing investment option. That actually, that exception didn't even apply under the contract because that exception only applies if, and this is under the contract, if a stable value subaccount is selected, and their trustee who has all the authority under the contract, the only investment options even under the contracts are the ones selected by the trustee. We identify that in the brief that's in both contracts. And here, the trustee of the Burge plan specifically elected not to use the separate, in the stable value subaccount. In fact, what they don't point out to you is that later in the contract itself, under the description of each of the investment options, it's available in the big menu, it says specifically that if the stable, and this is at JA-268 for your reference, if a stable value subaccount is selected as an investment option by the contract holder, by the trustee, the money market fund subaccount cannot be selected by the contract holder because that's a competing investment option. Count 7, as you identified, says specifically the plaintiff was invested in the money market subaccount. So we know that the Burge trustee did not select the stable value and the Burge trustee retained all the rights. So this case is exactly like Renfro. At any time, the trustees could select investments outside of the contract. At any time, the trustees could terminate the contract and use a different provider. In fact, just to clear the record, there was no termination fee. I mean, the Department of Labor identifies in their brief and some of the district court decisions that were relied upon by appellants in their brief talk about instances where there's a termination fee, which the DOL says could stand as an obstacle to a trustee making a decision. Here, as we point out in the contract, there were no termination fees. And the pleading that the Department of Labor refers to is just a generic pleading that says that some plans might have termination fees. There's no pleading that there was a termination fee. I'd like to turn also to the sales and service fee. Actually, there was another record involving the sales and service fee. Just to answer the question for my counsel. It's paragraph 293 of the second amended complaint, which is the operative complaint. That's the paragraph in which the conclusory allegation that the sales and service fee is set unilaterally appears. And why I say conclusory allegation is this, Your Honors. There's no well-pleaded allegation as there must be. Does it allege that it wasn't disclosed? It does not allege that it was not disclosed. What it alleges is that it was set unilaterally. There's no allegation whatsoever about the disclosures that were made to the trustee. Yes, in the record, there are disclosures that were made to participants after the contract came into effect. But what's important under the Renfro analysis, under Judge Sirica's decision, is what authority the trustee had in selecting this product for this plan. There is no well-pleaded allegation in here about the discussions that the trustee had with anybody. It's not even clear that John Hancock was part of that conversation under state insurance law, which still applies. An independent broker or insurance agent has to sell these products. Typically, it's the case John Hancock doesn't even show up when there's a product being sold and it's not represented. So we know nothing about what the trustee actually had. And under Twombly and Iqbal, they can't just come into court and invoke the court's jurisdiction and all the asymmetrical discovery costs on John Hancock with not a single allegation except for a conclusion. So let me get back to 293 where they say unilaterally. So this is at JA 87. And what they say specifically in their complaint is that Defendant John Hancock sets the sales and service fee unilaterally and without any oversight which prevents any assurance that the fee is the product of an arm's-length negotiation. In the preceding five paragraphs, 287 through 292, they compare the mutual fund regime and they compare that to 12B1 fees, which are a fee applicable under the Investment Company Act of 1940 and under SEC regulations. A 12B1 fee is a fee that a mutual fund charges and it has to be set under SEC regulations by a vote of the independent trustees of the mutual fund. In this context, what this says is that the sales and service fee is not done with the independent trustees of the mutual fund knowledge. And we fully acknowledge that. But there's nothing in the contracts that also says that the only investment options and investment options are the separate accounts that have a sales and service fee and administrative maintenance charge, which I'll address in a moment, and the mutual funds themselves. And all the fees that are at issue are either assessed by the mutual funds or at the separate account level. Those are the investment options, the separate accounts holding the mutual funds. And Section 3 of each contract says specifically that the only investments that can be allowed are investment options selected by the contract holder, which is the trustee. So all of these fees by contract had to have been selected by the trustee. And again, there's no allegations about those negotiations. And even if there was some concern at all about the sales and service fee, that only addresses counts 1 and 2 of the complaint and not counts 3 through 7. We agree, by the way, with Your Honor, Judge Van Antwerpen, that count 6 is now abandoned. You know, they've acknowledged in their reply brief that they're not claiming anything about revenue sharing. And, in fact, when they talk about the ANC being adopted through the counts in the complaint, what I'll note, Your Honors, is a 215-page second-menu complaint. This was not something somebody put together in an afternoon, I'm sure. They are very specifically enumerated claims and counts in that complaint. And count 6 is the only place that incorporates any reference about the administrative maintenance charge. And, by the way, the briefing talks about the administrative maintenance charge. What the complaint actually says is that there was no administrative maintenance charge. They say it was a fiction. And, in fact, if you look at the three investment options that Ms. Sanameno invested in, you'll see in the tables that they supply, you'll see that there was zero AMC for all three of her investment options. That's at JA-177, the blue-chip growth fund. This is their allegation. This is the complaint. No AMC for Ms. Sanameno in the blue-chip growth fund. No AMC for Ms. Sanameno at JA-186 in the JAH small-cap growth investment option. And no AMC for Ms. Sanameno in the JAH money market investment option at JA-194. The other two were invested in funds that had a static AMC that was at 10 basis points or 0.10%. But what the actual count 6 says is that the AMC is a fiction and that incorporates the other allegations, that there was no AMC. And what count 6, count 6 is headed, that it's about revenue sharing. That's the title of count 6 is revenue sharing, not AMC. And the specific breaches of paragraphs 13 through 16 in count 6, every time they use the word breach, they use it in a sentence that contains the word revenue sharing and not in a sentence that contains administrative maintenance charge and the only damage that's sought in count 6 is for revenue sharing, not for this AMC. So the AMC isn't properly part of the complaint. Now, counsel also argued with this fund check, which was a periodic publication that John Hancock made available to trustees and participants. And they point out, you didn't have the citation, but I'll provide it to you. It's at JA 382 as an example of the fund check. And it does say, we acknowledge, that the fund check is, quote, plan specific. But what it then says is that the fund check, quote, provides an evaluation of each of the investment options selected for their plan. And there is, of course, the trustees because they have all the power in this product. And so what fund check does is, and there's nothing about fund check that says there's anything individualized with respect to any plan or any participant. It just lists the particular funds that were made available. That's not investment advice. That's not plan specific investment advice. In fact, the DOL regulations and notably the Department of Labor did not join the argument that its regulation was invalid. The Department of Labor is not making an investment advice argument in this case. The valid regulation, which every single court that's addressed it has applied it. Granted, they haven't gone through to determine whether under Chevron, but they've all applied it. And what it requires is a mutual agreement between the parties that the information will serve as a primary basis for individualized investment advice. There's no mutual agreement here. What the contracts here, first of all, there's nothing about what the trustees relied on, nothing about the negotiations that the trustees had. But also the contracts themselves state quite specifically that John Hancock, that the mutual agreement of the parties was to the contrary, that John Hancock would not provide any investment advice because it says specifically that John Hancock is not assuming the obligation of the trustee, a plan administrator, or any other fiduciary of the plan. And that's at, just for your reference, it's in the record at pages JA-226, and that's for the Skybull contract, I'm sorry, that's for the Burge contract, and then later that's at JA-285. Just also to correct another error that Your Honors led with, Judge Fischer, you had talked about the separate Santa Meno versus John Hancock case. It's actually a case against Transamerica, so John Hancock is not involved in that case out in California. And if anything, what that case points out to me is the disingenuousness of the argument that the trustees had somehow ceded all of their responsibility for investments and fund selection to John Hancock. Because what we have in the Transamerica case are two of the three participants in front of you, both Karen Poley and Barbara Poley are plaintiffs in that case, even though it's a different Ms. Santa Meno. The trustee of the same plan, the Skybull plan, which is now called QualCare, and the trustee in the record is the CFO of that, that the CFO has switched from John Hancock to Transamerica. Now, if it's the case that Skybull trustees were relying primarily on John Hancock  versus where they then go to a competitor. And in fact, what participants argue is that the advice John Hancock gave was this very investment structure that they're challenging. The trustees went to the exact same investment structure with another provider. And so, you know, as we say in the briefs, Your Honor, this is an exceptionally competitive industry. The ACLI mentioned that and that's not refuted. There's hundreds of insurance companies, mutual funds, banks, providing these investment options and services to 401K plans. Everything that's being challenged in this case is an attribute of that product. All of the challenges relate to fees that are found in the investment options on the menu. And those are all part of the product attributes. As Judge Sirica said in Renfro, that's all decided well before there's any relationship to a plan. Let's go back, though, to the sales and service fees. Yes. If the fees are imposed unilaterally, which you acknowledge. No, we acknowledge there's a conclusory allegation of unilateral list. We don't acknowledge that there's any well-pleaded allegation that there's been actually a fee that in this competitive market any trustee didn't know about. We don't acknowledge that they were unilateral. We acknowledge conclusory allegation. We acknowledge that paragraph 293. Contains a conclusory allegation. We acknowledge that. Makes a conclusory allegation. A conclusory allegation not even that the trustees didn't know about it, just that there's no mutual fund oversight. But if that's true, that's through the chase. Yes. If that's true, aren't you then at that point exercising discretion in setting your fee? I would still argue that we aren't, because the trustee can still only invest in investment options that it selects, and so the sales and service fee applies to all of the investment options. The trustee can terminate at any time. So I would argue that you could imagine a set of circumstances. I grant you your honor. You could imagine a set of circumstances where if there was truly a fee that was imposed that the trustee had no ability to avoid for his plan and that it usurped the authority of the trustee by imposing that fee, that there could be fiduciary status for that fee only, not for the whole pamphlet, you know, the investment advisor fee that's challenged in count five. It has nothing to do with this. But if it's not disclosed as well as being unilateral, then it's a different case than Renfro, is it not? There's lots of ways it could be a different case than Renfro. That's not the case here because there's no well-pleaded allegation here that the trustee is the decision-maker, didn't know about that fee, and had the opportunity to reject it. Okay. Let's assume that they argue that there is an allegation. I would argue that under Twombly, they can't make conclusory allegations to support a complaint. If there was a, if they brought in the trustee, if they had some, you know, discussion with the trustee before they brought suit, if they had made some well-pleaded allegation that the trustee was never told about this, it was put in over the trustee's objection, then you could imagine a set of circumstances. And the trustee couldn't terminate, then you could imagine a set of circumstances where that could be a breach of fiduciary or fiduciary status with respect to that fee only. Again, you know, plaintiffs try and paint with a very broad brush. They point to general language in Supreme Court decisions about broadly construing fiduciary status. I would point out two other Supreme Court decisions in the briefing. One is the Merton's case in 1993, where the court at the same, the court specifically rejected the idea that vague notions of the statute's purpose can overcome its specific text. And then ERISA was a carefully crafted statute that resulted in compromise. And what Merton said is that fiduciary status only arises in increments. There's no fiduciary at large. It only arises in increments so that it can properly allocate liability to those people who are the ones who are making the decisions. The other case that I would point to is Pegram, which says virtually the same thing. And in Pegram, in fact, it held that a service provider to an ERISA-governed plan, in that case it was an HMO arrangement, was not a fiduciary, even though there was discretion with respect to the fees, even though the fees were set. The court in Pegram said that you have to parse the complaint carefully and that you have to look at who's the real decision maker. And here, Your Honor, the trustees acknowledge there are conclusory allegations, and I acknowledge that there's pleadings that go even beyond the conclusory allegations, I mean briefs that go even beyond the conclusory allegations. But when you get right to it, there's no specific allegation that the trustees had their authority usurped, that anything was hidden from the trustees, that any trustee were duped. And, you know, in one case, the trustee in Skybull was the president of the company. So, you know, these are folks who it's all outside of the record. They can't sustain a complaint based on that. Let me also address a few other points that were raised. You know, certainly this idea of termination fee, as I mentioned, you know, there's no dispute, there really is no dispute about termination fee. We pointed out the record sites on that in our brief, and on reply, plaintiffs aren't even arguing that there was a termination fee, that there simply was no termination fee here, even though maybe in some other instances there might have been in other contracts. But in these contracts specifically, there's specific schedules that say that there were no termination fees under the arrangement that these trustees agreed to. The Department of Labor has also raised an argument under 321A, Romanette 3, about planned administration. We acknowledge there's some confusion in the cases about where that line between administration and management is, but plaintiffs don't make this argument. It's been waived. The ACLI points out the cases. You know, this is not an argument. I mean, the plaintiffs make one, they have one sentence in their opening brief about A3. They don't talk about it again after that. This is an argument that's been waived. And in any event, you know, we think that the issues that are presented here, I deal with the management of the plan, you know, what kind of investments are going to be offered, what the fees are for those investments. Really fairly, that's more like plan management issues. Okay. If you don't have anything else? I don't have anything else, Your Honor. All right. Well, thank you very much. And we'll hear back from Mr. Skillman on Buttle. Excuse me. I thought that they're supporting amicus and asked for argument also. Just very briefly, the paragraph alluded to by Counselor John Hancock, paragraph 293, was the paragraph that I had in mind in responding to your question. Well, you acknowledge that there was no allegation in that paragraph that the fee was undisclosed. That is correct. Okay. You're an amended point, aren't you? You've amended your pleadings already once, haven't you, your complaint? Correct. So this is not your first bite at the apple? That is correct also. And is this a heightened standard pleading, this type of action? No, they haven't extended it to that yet. I don't think there's any heightened standard, no. Nevertheless, it's not heightened, but you can't overcome reality or specific things with generalized allegations, right? That is correct. But our essential allegation is that these fees, even if disclosed, are excessive. And furthermore, that John Hancock retained the power throughout the performance of the contract to increase those fees. And, in fact, the complaint shows that those fees, and most particularly the administrative maintenance charge. They haven't increased them? Yes. All right. I think it's at 202 and 203. 202 and 203 of the complaint shows that the administrative maintenance charge has been increased during the course of performance of the contract, so that they not only, in the contracts, retain the authority to increase the fees, but have, in fact, increased them. And that's set forth in the tables that are part of the complaint. Thank you very much. Thank you very much. And we thank all counsel for cases very well briefed.